

FILED

SEP 2 6 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
D_____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MATTHEW AARON BLANFORD,          )
                                 )     NO. CV S-01-2068 GEB/GGH
                Plaintiff,       )
                                 )
        v.                       )     ORDER
                                 )
SACRAMENTO COUNTY, SACRAMENTO    )
COUNTY SHERIFF LOU BLANAS,       )
SACRAMENTO COUNTY SHERIFF'S      )
DEPUTY BRETT ANDERSON (Badge     )
#1101), SACRAMENTO COUNTY        )
SHERIFF'S DEPUTY TODD HENGEL     )
(Badge #1120),*                  )
                                 )
                Defendants.      )
_____)

        Defendants move for summary judgment on all of Plaintiff

Matthew Blanford's federal and state claims.  Blanford alleges

Sacramento County Sheriff's deputies Brett Anderson and Todd Hengel

used excessive force when they shot him several times and arrested him

without probable cause, in violation of his Fourth Amendment rights.

Both deputies assert the qualified immunity defense against Blanford's

constitutional claims.  Blanford further alleges that the Sheriff is

_____

        *       The caption has been amended to reflect the dismissal of Doe
defendants pursuant to the February 22, 2002, Status (Pretrial
Scheduling) Order.

1  liable in his individual capacity because he ratified these deputies'

2  use of excessive force.  Blanford also sues the Sheriff in his

3  official capacity and Sacramento County, alleging that the Sheriff's

4  Department maintains a policy of rewarding deputies who use deadly

5  force.

6        Blanford opposes Defendants' motion and moves for partial

7  summary judgment on his federal excessive force claim, arguing that

8  two of the three volleys of shots fired by the deputies were

9  unreasonable as a matter of law.[1]

10                                   I.

11                         STANDARD OF REVIEW

12 A.  SUMMARY JUDGMENT STANDARD

13        Summary judgment is proper where the pleadings, depositions,

14 answers to interrogatories, affidavits, and admissions on file show

15 there is no genuine issue as to any material fact, and that the moving

16 party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

17 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The

18 'materiality' requirement provides that 'only disputes over facts that

19 might affect the outcome of the suit under the governing law will

20 properly preclude entry of summary judgment."  Cline v. Industrial

21 Maintenance Eng'g and Contracting, 200 F.3d 1223, 1229 (9th Cir.

22 2000).  A genuine issue of fact is admitted evidence sufficient for a

23 reasonable jury to return a verdict for the nonmoving party.  Id.

24 "[R]easonableness becomes a question of law appropriate for

25 determination on motion for summary judgment when only one conclusion

26 _____

27        [1]    Deputy Anderson appears to dispute Blanford's
   characterization of this shooting as separate volleys of shots,
28 describing the shooting as "kind of a continuous event."  (Anderson
   Depo. at 127.)

about the conduct's reasonableness is possible." <u>West v. State Farm</u> <u>Fire and Cas. Co.</u>, 868 F.2d 348, 351 (9th Cir. 1989).  In considering a motion for summary judgment, the court "must draw all justifiable inferences in favor" of the nonmovant, "'including questions of credibility and the weight to be accorded particular evidence.'" <u>Kaelin v. Globe Communications Corp.</u>, 162 F.3d 1036, 1039 (9th Cir. 1998); <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

> [When opposing a motion for summary judgment] the nonmoving party must set forth, by affidavit or as otherwise . . . "*specific facts* showing that there is a genuine issue for trial. . . ."  Hence, the nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim. . . .  Instead, it must produce at least some "significant probative evidence. . . ."

> "[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury . . . to resolve the parties' differing versions of the truth at trial."

> Inferences must also be drawn in the light most favorable to the nonmoving party.  Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts, and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party. Assuming the existence of these underlying facts, however, an inference as to another material fact may be drawn in favor of the nonmoving party only if it is "rational" or "reasonable" and otherwise permissible under the governing substantive law.  Clearly, there must be some limit on the extent of the inferences that may be drawn in the nonmoving party's favor from whatever "specific facts" it sets forth; if not, Rule 56(e)'s requirement of "specific facts" would be entirely gutted.

> Thus, the court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in [the nonmovant's] favor based on that evidence.

T.W. Elec. Service v. Pacific Elec. Contractors, 809 F.2d 626, 630-31 (9th Cir. 1987) (citations omitted; emphasis in original).

B.   QUALIFIED IMMUNITY STANDARD

Evaluation of each deputy's qualified immunity defense requires determination of whether "the officer[s'] conduct violated a constitutional right."   Saucier v. Katz, 533 U.S. 194, 201 ((2001).

> "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1129 (9th Cir. 2002) (citation omitted).

> Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  The privilege is "an *immunity from suit* rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial."  As a result, "[the Supreme Court] ha[s] routinely stressed the importance of resolving immunity questions at the earliest possible stage of litigation."

Saucier, 533 U.S. at 200-01.

4

II.

BACKGROUND[2]

On November 13, 2000, the Sacramento County Sheriff's Department received two telephone calls reporting a masked man carrying a machete or sword in a residential neighborhood. (Calnero Decl. Ex. K.) Deputies Anderson and Hengel were dispatched to the scene. (Anderson Depo. at 20.) The deputies were informed by the dispatcher that the man was reported to have a ski mask partially covering his face, and that he had been licking the sword. (Id. at 36.) The dispatcher also informed the deputies that the man was walking in the middle of the street. (Hengel Decl. ¶ 5.) The deputies arrived in the residential neighborhood in separate squad cars and spotted Blanford on Reetey Avenue. (Anderson Decl. ¶ 5 and Anderson Depo. at 20; Hengel Decl. ¶ 5.)

The deputies saw him walking in the street carrying a sword, which resembled a Civil War cavalry saber; it was approximately two and a half feet long. (Anderson Depo. at 27, 48-49.) Blanford was holding the sword by its handle. (Id. at 83.) Blanford did not have his face masked and was wearing a knit cap which a deputy perceived as capable of being pulled down over his face like a ski mask. (Hengel Depo. at 51.) Blanford was wearing a leather jacket and was faced away from the deputies. (Blanford Depo. at 140; Anderson Depo. at 27.) The deputies exited their vehicles, drew their weapons, and

---

[2] Except for disputed facts concerning Blanford's characterization of the third shooting volley, this background sets forth non-conflicting versions of events under summary judgment standards, because it is based either on facts considered in the light most favorable to the nonmovant or on which there is no genuine dispute.

called out: "Sheriff's department, stop, drop the sword." (Anderson
Depo. at 27; Hengel Depo. at 82.)

Blanford kept walking, causing the deputies to believe he
was ignoring the command. Blanford was listening to a "discman" at
the loudest volume. (Blanford Depo. at 155-56, 161.) "The headphones
were broken, and [Blanford] was using [a green cap] to keep them
together;" with the headphones underneath the cap.[3] (Id. at 140,
161.) Deputy Hengel testified he did not see Blanford's headphones
until after the shooting. (Hengel Depo. at 51-52.) The record is
silent as to whether Deputy Anderson saw the headphones; he testified
Blanford wore what appeared to be a dark knit cap at all times until
after the shooting. (Anderson Depo. at 69-70.) Blanford did not then
hear the deputies yelling, and did not notice the deputies. (Id. at
160.) Blanford continued walking down Reetey toward Gaines. (Id. at
160-61.) The deputies followed, keeping a safe distance behind him of
approximately 20 to 25 feet and kept their guns pointed at him
throughout the incident. (Hengel Depo. at 81-82; Hengel Decl. at ¶ 7;
Anderson Decl. at ¶ 7.) The deputies kept "a safe distance [behind
Blanford] due to [Blanford's] possession of the sword, a deadly edged
weapon." (Anderson Decl. ¶ 7; Hengel Decl. ¶ 7.) They were
"extremely concerned that BLANFORD posed a significant danger to any
individual who might come near him or to [the deputies] if he turned
and charged [them]." (Id.) When following him, the deputies yelled
commands at Blanford including: "Drop the sword," "We'll shoot," "Put

---

[3]    Blanford described the cap as "the type that you could pull
down over your face . . . ." (Blanford Depo. at 140.)

it down; We don't want to shoot.[4]  (Anderson Depo. at 77-78.)  The
deputies declare:  "This danger increased in [their minds] once
BLANFORD stopped near the corner of Reetey and Gaines [and] held up
the sword and made a loud growl or roar sound."[5]  (Anderson Decl. ¶ 7;
Hengel Decl. ¶ 7.)  The deputies considered this act "constituted the
felony of brandishing a deadly weapon at a peace officer pursuant to
Penal Code §417.8.[6]  BLANFORD then turned onto Gaines Avenue and

_____

[4]    This deposition testimony is corroborated by the dispatch
tape on which one of the deputies can be heard yelling "Put the sword
down now!"  Calnero Decl. Ex. K at 7.)  Further, a resident in the
neighborhood testified he heard someone say something to Blanford
which caused him to look out his window; he saw the deputies following
Blanford as he walked "kind of [in] the middle" of the street, and
closer to that resident's side of the street.  (Lantz Depo. at 10-11.)

[5]    Blanford's deposition testimony on this point does not
create a genuine issue of material fact about the sound the deputies
declare he made.  That testimony follows:
           Q     At any time after you turned right on Gaines and before
                 you step back on your parents' property, do you recall
                 making any type of sound, grunt, growl, howl?
           A     No.
Blanford's failure to "recall" whether he made the sound the
deputies declare they heard him make "is not enough, by itself, to
create a genuine issue of material fact."  Dickie v. Baptist Memorial
Hospital-North Mississippi, 146 F.3d 262, 266 (5th Cir. 1998) (stating
that the mere fact that witness does not remember an alleged phone
conversation does not create a material fact about its occurrence).

[6]    Blanford's deposition testimony on this point is
insufficient to controvert the deputies' averments because in essence
Blanford testified he does not remember whether he raised the sword as
he was walking in the street.  Blanford's testimony on this point
follows:
           Q     After you turned right on Gaines, did you then proceed
                 toward your parents' house?
           A     Yes.
           Q     And at any time prior to reaching your parents'
                 property, did you stop and raise the sword in any
                 fashion?
           A     Not to my knowledge.
           Q     Was it possible you did that and you just don't
                 remember?

(continued...)

7

1 continued . . . walk[ing] away from [the deputies].  [They] continued

2 to follow him down Gaines."  (Id.)  The deputies considered Blanford

3 might be mentally disturbed or under the influence of narcotics, but

4 regardless of what influenced his actions, they believed they "had to

5 secure the weapon before doing anything else in order to protect the

6 public."  (Anderson Decl. ¶ 6; Hengel Decl. ¶ 6.)

7 Blanford described the events leading to the shooting as

8 follows:

9   Q At some point, did you become aware that
   there were some police officers near you?

10   . . . .
  A Yes.

11   Q Okay.  When did you first become aware that

12 _____

13  [6](...continued)
   MR. POSWALL:  I'm going to object.  If you ask

14   "was it possible," you're asking him to speculate.  All
  he can tell you is what he remembers, and he's told you

15   he doesn't remember doing that.
   MR. CASSIDY:  No, he said it's not to his

16   knowledge.
   MR. POSWALL:  Then you're asking him to speculate

17   if you ask him is it possible.  He said not to his
  knowledge.  He doesn't know.

18   Q BY MR. CASSIDY:  So you don't remember one way or the
  other whether you raised the sword in any fashion

19   between the time you turned right on Gaines and the
  time you reached your parents' property, correct?

20   A I don't remember raising the sword.

21 (Blanford Depo. at 162.)

22   Blanford's failure to remember whether he raised the sword
lacks factual data sufficient to support a reasonable inference that

23 he did not raise his sword "at any time prior to reaching [his]
parents' house."  See Cermetek, Inc. v. Butler Avpak, Inc., 573 F.2d

24 1370, 1377 (9th Cir. 1978) (where the Ninth Circuit indicates that the
nature of a witness's assertion must be examined to determine if it is

25 a matter on which the affiant is competent to testify, indicating that
"facts alleged on 'understanding' like those based on 'belief' might

26 not be sufficient to create a genuine issue of fact."); Turiano v.
Schnarrs, 904 F. Supp. 400, 407 (M.D. Pa. 1995) (same).  A jury "is

27 permitted to draw only those inferences of which the evidence is
reasonably susceptible; it may not resort to speculation."  British

28 Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

| | | |
|---|---|---|
| 1 | | there were any peace officers that are near you prior to the time you're shot? |
| 2 | A | My next door neighbor's house. |
| | Q | And what draws your attention to those officers? |
| 3 | | |
| | A | I just became aware that they were there.  I don't know what tipped me off.  I don't know if they were there for me.  I just kind of knew they were there. |
| 4 | | |
| 5 | | |
| | | .  .  .  . |
| 6 | Q | And at that point, did you stop to see what these police officers were doing? |
| 7 | A | No. |
| | Q | Were you concerned that you were carring the sword, and that these police officers might want to find out why you have this sword? |
| 8 | | |
| 9 | | .  .  .  . |
| | A | Yeah.  I think so, yeah. |
| 10 | | |
| | Q | All right.  And at the point you became aware that there were police officers nearby, you continued walking toward your parents' house, correct? |
| 11 | | |
| 12 | | |
| | A | That's correct. |
| 13 | Q | Did you hasten your pace at all toward your parents' house after you became aware the police officers were nearby? |
| 14 | | |
| | A | No. |
| 15 | | .  .  .  . |
| | Q | At some point did you become aware that the police officers had gotten closer to you? |
| 16 | | |
| | A | Yeah. |
| 17 | Q | When was that? |
| | A | When I got to the front door. |
| 18 | Q | So when you went further up Gaines to your parents' residence, did you walk up the driveway? |
| 19 | | |
| | A | No. |
| 20 | Q | Okay, how did you walk up onto your parents' property? |
| 21 | A | I walked up the lawn. |
| | | .  .  .  . |
| 22 | Q | What happens next? |
| | A | I reached in my pants for my keys.  Didn't have them, so I knocked on the door to see if my brother would answer, and he didn't.  So I turned around.  And I think I caught a glimpse of the police. |
| 23 | | |
| 24 | | |
| 25 | Q | And where were the police at that time? |
| 26 | | |
| | A | They were - I didn't really see them, but I think they were like to the left of me, in front and to the left. |
| 27 | | |
| 28 | Q | Okay.  Had you already turned to walk away from your parents' front door? |

1    A    Yeah, I was away - facing away from my house.
     Q    Okay.  So you were facing the street?
2    A    Yeah.
     Q    All right.  And when you were facing the
3         street, looking out into the street, you
          could see the police officers slightly in
4         front of the house to the left?
     A    I could see what I thought was police
5         officers.
     Q    And what could you see those police officers
6         doing?
     A    Nothing. . . .  I just saw some black in my
7         peripheral.
     Q    Okay.  Did you stop at that point to find out
8         what these people, who you thought might be
          police officers, were doing?
9    A    I don't know if I turned off the Walkman or
          what, but I heard them say, "Drop the sword."
10        . . . .
     Q    Where were you located when you heard the
11        police officers say, "Drop the sword"?
     A    In the walkway near the front door.
12   Q    And was that police officer yelling that
          toward you?
13   A    He must have been, because I think I heard
          him over the headphones, or I heard him
14        clearly.
     Q    Okay.  And at that point, did you drop the
15        sword?
     A    No.  I thought I told them that I was going
16        to go put it in the back and come up and talk
          to them afterwards.
17   Q    What makes you think you thought you told
          them you were going to put it in the back and
18        come out and talk with them?
     A    That's how I remember it. . . . [Then] I
19        walked, yeah, in front of the garage and
          around to the side.
20        . . . .
     Q    As you walked from the location . . . where
21        you had heard the police officer say, "Drop
          the sword," from that location to where the
22        end of the walkway is, did you look out in
          the street area to see who was out there?
23   A    No.
     Q    Where were you looking as you walked down the
24        walkway?
     A    I was looking straight ahead while I was
25        walking to the gate.
          . . . .
26
     Q    And you thought that in response to . . . the
27        police officer saying "Drop the sword," you
          said you told him you were going to put it in
28        the back and come out and talk to him?
     A    Correct.

```
1          Q     And did you say that as you were walking down
                 the walkway . . . towards the garage?
2          A     That's what I think I said.[7]
```

3    (Blanford Depo. at 160-180.)

4    Blanford walked past the corner of the garage and turned to

5    his right, where there was a gate.  (Blanford Depo. at 184.)   Deputy

6    Anderson could not see around the corner of the garage, but Deputy

7    Hengel could see the gate from where he was standing.  (Anderson Depo.

8    at 115; Hengel Depo. at 113.)  As Blanford was approaching the corner

9    of the garage area neither deputy believed he should be allowed to get

10   out of sight and into the back of the house due to the danger he

11   presented anyone in the back yard and in the residence.  (Anderson

12   Decl. ¶ 8; Hengel Decl. ¶ 8).  Both deputies shot him in the back.

13   (Blanford Depo. at 184-85; Anderson Depo. at 112; Hengel Depo. at

14   109.)  The deputies were unaware that Blanford was seeking entry into

15   his own home.  (Anderson Depo. at 111; and Anderson Decl. ¶¶ 8 and 10;

16   Hengel Decl. ¶¶ 7, 8, and 10.)

17   Although Blanford was hit by at least one shot, he went

18   through the gate and it closed behind him.  (Anderson Depo. at 121-22;

19   Hengel Depo. at 113.)  Deputy Anderson kicked the gate open and

20   observed Blanford standing on the other side approximately ten feet

21   away, near a door leading into the garage.[8]  (Anderson Depo. at 122.)

22   Blanford testified:

23

24   ────────────────

25   [7]     The deputies never heard Blanford say "what [he thought he]
     said."  Anderson testified that Blanford "never responded verbally to
26   any of [the deputies'] commands."  (Anderson Depo. at 78.)  Hengel
     testified that Blanford "didn't say anything."  (Hengel Depo. at 86.)

27
28   [8]     A photograph of the property reveals that the garage is
     attached to the house in a manner suggesting that one could enter the
     house from inside the garage.  (Hengel Depo. Ex. 8.)

                                  11

```
 1   Q   After you got inside the gate, did you move
         toward the side door to the garage to try to
 2       get in that door?
     A   At some point.
 3   Q   And do you recall if the additional shots
         were fired before or after you attempted to
 4       get to that side door to get into the garage?
     A   Afterwards, I think.
 5   . . . .
     Q   Do you specifically remember what you were
 6       doing at the door, the side door to the
         garage?
 7   A   I found myself there.  I guess I was pushed
         there after getting shot a couple times.  And
 8       I think I remember reaching for the door.
     Q   Okay.  Do you recall which hand you reached
 9       up for the door?
     A   No.
10   . . . .
     Q   And at that point when you were standing next
11       to the side door to the garage on the side
         yard, you still had the sword in your hand,
12       correct?
     A   I don't know.
13   Q   Okay.  And at that point, additional shots
         are fired, correct?
14   A   Correct.
     Q   Do you know if any of those hit you?
15   A   Felt like all of them.
     Q   Okay.  What happens next?
16   . . . .
     A   I got swung around so I was facing [the
17       deputies].
     Q   Facing where, I'm sorry?
18   A   Facing where I thought the bullets were
         coming from.
19   Q   Okay.
     A   And then I put my hand in front of my face.
20   Q   What happens next?
     A   And I think I got shot a couple more times.
21       And then I just remember a ringing sound and
         then fell and hit my head on the sidewalk.
22   . . . .
     Q   When you were standing by the side door to
23       the garage in the side yard, can you state
         where it was that you were struck by bullets?
24   A   In the side, I think.  And then I was turned
         around and got shot in the front.
25   Q   And so you were facing the street when
         you got shot in the front?
26   A   Yeah.

27

28
```

```
1           Q    All right.  So you got shot by the side door, and then
                 you said that moved you into a position where you were
2                facing toward the front of the house or the street?
            A    I was facing the guns.
3
```

4   (Blanford Depo. at 186-88, 194.)

5          Deputy Anderson declares he "continued to follow BLANFORD by

6   kicking the gate open and entering into the side yard area.  He again

7   ordered him to drop the sword.  BLANFORD, however, continued to hold

8   the sword and was trying to open a door to the side garage area.

9   Thus, [Deputy Anderson] fired more rounds at BLANFORD."  (Anderson

10  Decl. ¶ 9.)  Anderson's deposition testimony follows:

```
11          A    [Blanford] was . . . at the side garage door
                 with his left hand on the doorknob, leaning
12               and pushing against the door, and he had the
                 sword in his right hand.
13          Q    Was he still facing essentially away from
                 you?
14          A    More side to.
            Q    More facing toward the door?
15          A    Facing toward the door.
            . . . .
16          Q    And do you remember approximately how many
                 rounds you fired from that position?
17          A    I'm not sure.
            Q    Did you hit him with any of those rounds?
18          A    I believe I did.
            Q    And what makes you believe you did?
19          A    This was after - afterwards finding or seeing
                 some of the wounds on his right - right
20               wrist, which was toward me when I fired, with
                 the sword in that hand.  And the fact that
21               after that he finally went down is when I
                 stopped shooting.
22          Q    Okay.  And so the - as I understand it then,
                 he was standing with his - trying to open the
23               door with his left hand pretty much facing
                 the door?
24          A    Yeah, I think he was leaning against the door
                 with probably his left shoulder -
25          Q    Okay.
            A    - pushing on the door.
26          . . . .
            Q    After you do the second volley of shooting,
27               what does [Blanford] do?
            A    I don't know that there was a definite
28               completion of a second volley.  It was kind
                 of a continuous event.  I had come through
```

1         the gate, ordered him to drop the sword, put
               the sword down.  He continued trying to force
2         entry or gain entry into the residence.
               Again, I was concerned at that point that he
3         would be able to get into the residence and
               cause death or injury to the people in the
4         residence.  So when he did not stop, I fired
               again at which point he turned and started
5         walking away from me

     . . . .
6         [H]e was walking into the back yard enclosure

     . . . .
7         I kept firing and then he went down.

     . . . .
8      Q    [C]an you give me any estimate at all of
               where that was, where he finally ended up
9         laying on the ground in proximity to [the
               garage] door?
10     A    That's a guess, five or ten feet.
     Q    And by the way, when you shot him in the
11        right hand, he dropped the sword, didn't he?
     A    No.
12     Q    So you shot him in the hand the sword was in,
               and you're saying then he turned and
13        continued carrying the sword?

     . . . .
14     A    Yes.

15 (Anderson Depo at 124-133.)

16         Blanford was rendered a paraplegic.

17         The deputies received letters of commendation from the

18 Sheriff's Department as a result of this incident.  (Anderson Depo. at

19 143-45.)

20                          III.

21                   <u>DISCUSSION</u>

22 <u>A.  WHETHER EACH DEPUTY'S ALLEGED CONDUCT VIOLATED THE CONSTITUTION</u>

23         First, Blanford's excessive force claim is analyzed.  The

24 Ninth Circuit has explained:

25         A Fourth Amendment claim of excessive force is
             analyzed under the framework set forth by the
26        Supreme Court in <u>Graham v. Connor</u>, [490 U.S. 386
             (1989)].  That analysis requires balancing the
27        "nature and quality of the intrusion" on a
             person's liberty with the "countervailing
28        governmental interests at stake" **to determine
             whether the use of force was objectively**

1               **reasonable under the circumstances.** [Id. at 396.]
              Determining whether a police officer's use of
2               force was reasonable or excessive therefore
              "requires careful attention to the facts and
3               circumstances of each particular case" and a
              "careful balancing" of an individual's liberty
4               with the government's interest in the application
              of force. Id.; see Deorle v. Rutherford, 272 F.3d
5               1272, 1279-81 (9th Cir. 2001).

6 Drummond v. City of Anaheim, ___ F.3d ___, 2003 WL 22087574 at *3 (9th

7 Cir., Sep. 3, 2003) (emphasis added).

8               In Graham, the Supreme Court specified that the
              government interest in safely effecting an arrest
9               must be "examined in light of the 'severity of the
              crime at issue, whether the suspect poses an
10              immediate threat to the safety of the officers or
             others, and whether he is actively resisting
11              arrest or attempting to evade arrest by flight.'"

12 Id. at *4.

13              1.   Necessity for Deadly Force During First Volley

14      "'[T]he essence of the Graham objective reasonableness

15 analysis' is that '[t]he force which [i]s applied must be balanced

16 against the *need* for that force; it is the need for force which is at

17 the heart of the *Graham* factors.'"  Headwaters Forest Defense, 276

18 F.3d at 1130 (quoting Liston v. County of Riverside, 120 F.3d 965, 976

19 (9th Cir. 1997)).  The gunshots fired at Blanford were likely to cause

20 grave physical injury or death.  "In this Circuit . . . 'deadly force

21 is that force which is reasonably likely to cause death.'"  Monroe v.

22 City of Phoenix, Az, 248 F.3d 859 (9th Cir. 2001 (quoting Vera Cruz v.

23 City of Escondido, 139 F.3d 659, 663 (9th Cir. 1998)).  "It is

24 not . . . unconstitutional" to use deadly force "where the officer has

25 probable cause to believe that the suspect poses a threat of serious

26 physical harm, either to the officer or others. . . ."  Tennessee v.

27 Garner, 471 U.S. 1, 11 (1985).

28

1   Applying the <u>Graham</u> factors to the deputies' use of deadly

2   force reveals that the crime Blanford was accused of committing --

3   exhibiting a deadly weapon with the intent to resist or prevent arrest

4   or detention, which is prescribed in Penal Code § 417.8 -- when

5   considered in the context of which the deputies assert Blanford

6   committed it does not by itself justify use of deadly force.  But the

7   undisputed facts demonstrate Blanford continually failed to respond to

8   the deputies' repeated demands telling him to drop the sword, and

9   deadly force was not used until Blanford headed toward the entry gate

10  into the back yard of a private residence.

11       The reasonableness of the deputies' use of deadly force at

12  that moment is analyzed from the perspective of a hypothetically,

13  objectively created reasonable officer on the scene, faced with the

14  same circumstances the deputies encountered, rather than from

15  Blanford's unknown intentions.  "The calculus of reasonableness must

16  embody allowance for the fact that police officers are often forced to

17  make split-second judgments - in circumstances that are tense,

18  uncertain, and rapidly evolving - about the amount of force that is

19  necessary in a particular situation."  <u>Graham</u>, 490 U.S. at 396-97.

20       Both deputies declare they fired at Blanford to stop him and

21  neutralize the threat he presented to third parties who may have been

22  in the back yard he was about to enter.  But Blanford argues the

23  officers failed to warn him before the shooting and that the "force

24  employed was 'greater than [was] reasonable under the circumstances.'"

25  <u>Drummond</u>, 2003 WL 22087574 at * 5.

26       "[W]arnings should be given, when feasible, if the use of

27  force may result in serious injury" and the failure to warn is a

28  factor indicating the use of force was excessive force.  <u>Deorle</u>, 272

1  F.3d at 1284.  Blanford contends because he did not hear a warning, it
2  must be inferred no warning was given.

3        This contention is unsupported by the record.  Blanford
4  testified he never faced the deputies, and only got a "glimpse of
5  [them] but didn't really see them;" he "just saw black in [his]
6  peripheral" vision.  (Blanford Depo. at 168-69.)  Blanford "did not
7  testify that warnings were not given but only that he did not hear any
8  warnings.  [Blanford's] testimony fails to contradict the [deputies]
9  positive testimony that [they] warned [Blanford] before firing a
10 shot." Ford v. Childers, 855 F.2d 1271, 1276 (7th Cir. 1988).
11 "Consequently, [Blanford's] testimony that he did not *hear* any
12 warnings fails to present a question of material fact as to
13 whether . . . warnings . . . in fact . . . were given." Id.

14       Blanford also argues that the deputies should not have shot
15 him because they should have known he was on his own premises since he
16 went to the door of the house, and after being unable to find his
17 keys, knocked and waited for a response.[1]  Deputy Anderson testified
18 he did not see Blanford reach into his pocket.  (Anderson Depo. at
19 119.)  The record is silent on whether Deputy Hengel saw Blanford
20 reach into his pocket.  Witnessing what Blanford states happened has
21 little bearing on how a reasonable officer in the deputies' position
22 would have viewed Blanford's behavior.  Such an officer would not have
23 to conclude that Blanford was trying to enter his own house with the
24 sword.  A reasonable officer witnessing Blanford knock on the door
25 could have concluded that the house was not his home; people

26
27 _____

28       [1]   This testimony directly conflicts with the deputies'
   testimony but Blanford's version is accepted as true under summary
   judgment standards.

frequently knock on the doors of houses which are not their homes.
Blanford concedes after this failed entry, and as he was traveling
toward the side of the house, he heard whom he "thought [were] police
officers" stating "'Drop the sword.'" Yet he ignored the command,
failed to submit to police authority, and continued walking in a
direction headed toward the side and back yard of the residence.[2]

Even though a reasonable officer in the deputies' position
could have viewed Blanford's actions as a threat, he contends deadly
force should not have been used because it should have been obvious to
the deputies that he was an emotionally disturbed individual. <u>Deorle</u>,
272 F.3d at 1283 (emphasizing "that where it is or should be apparent
to the officers that the individual involved is emotionally disturbed
that is a factor that must be considered in determining . . . the
reasonableness of force employed"). The deputies "considered that
Blanford might be mentally ill or under the influence of some illegal
substance" but because he did not heed commands to drop the sword,
reasonable officers in the deputies' position could have concluded as

---

[2]     Blanford also argues that the deputies should have realized
he was on his own premises because he "*thought* [he] told them that
[he] was going to go put [the sword] in the back and come up and talk
to them afterwards." (Blanford Depo. at 169-70.) This testimony is
speculative because it does not state what Blanford actually said, if
anything; it only states what he thought he could have said. A
genuine dispute over the existence of a fact is not created through
mere speculation as to whether a thought materialized into spoken
words. Further, since Blanford was walking away from the deputies and
did not look at the deputies either while or after he said the
statement, he "thought" he made, even if he made this statement that
does not establish that the deputies heard it. Both deputies
testified they never received any verbal response from Blanford.
        Blanford also points out that the deputies were aware that a
person with a machete had been reported in the area on previous
occasions. (Anderson Depo. at 32.) But even if the deputies
suspected that Blanford lived in the area, they still would not know
whether he was entering his own house or attempting to evade them on
someone else's premises.

did the deputies that they had to secure that weapon before doing "anything else . . . ."  (Anderson Decl. ¶ 6; Hengel Decl. ¶ 6.)

Blanford asserts that the use of deadly force was excessive because the deputies had a SAGE SL6 37 millimeter gun ("SAGE gun") available.  The SAGE gun is a "less lethal" weapon which fires rubber projectiles.  (Smith Depo. at 6.)  Defendants rejoin Blanford "states without any supporting evidence, that the deputies were armed with a SAGE gun."  (Defs.' Reply at 4.)  But Blanford presents the duty roster for the date of the shooting which indicates that Deputy Anderson was issued a SAGE gun.  (Katz Decl. Ex. W.)  Deputy Anderson testified he did not have a SAGE gun, but was not questioned about the discrepancy between his testimony and the duty roster.  (Anderson Depo. at 95-96.)  Summary judgment jurisprudence mandates that this conflict be resolved in Blanford's favor.  Therefore, for purposes of this motion it is assumed that a SAGE gun was available for Deputy Anderson's use.

Deputy Hengel testified he did not have a SAGE gun in his squad car; he was not questioned about whether Deputy Anderson had one in the squad car he drove.  (Hengel Depo. at 49-50.)  It appears Blanford seeks to have the inference drawn from the duty roster which would establish that Deputy Hengel knew Deputy Anderson had been issued a SAGE gun.  There is no evidence indicating that the deputies saw the duty roster before their work shifts began, or that Deputy Hengel had reason to know what weapons had been issued to Deputy Anderson.  The mere fact that the duty roster indicated Deputy Anderson was issued a SAGE gun does not create a reasonable inference that Deputy Hengel knew about its issuance.  To hold otherwise would allow speculation to create a genuine issue of material fact.

> The line between a reasonable inference that may
> permissibly be drawn by a jury from basic facts in
> evidence and an impermissible speculation is not
> drawn by judicial idiosyncrasies.   The line is
> drawn by the laws of logic.   If there is an
> experience of logical probability that an ultimate
> fact will follow a stated narrative or historical
> fact, then the jury is given the opportunity to
> draw a conclusion because there is a reasonable
> probability that the conclusion flows from the
> proven facts.

Poppell v. City of San Diego, 149 F.3d 951, 954 (9th Cir. 1998).

Blanford argues since Deputy Anderson was issued a SAGE gun, his use of deadly force was unnecessary.  "The necessity inquiry is a factual one 'Did a reasonable non-deadly alternative exist for apprehending the suspect?'"  Forrett v. Richardson, 112 F.3d 416, 420 (9th Cir. 1997) (quoting Brower v. County of Inyo, 884 F.2d 1316, 1318 (9th Cir. 1989)), overruled on other grounds by Chroma Lighting v. GTE Products Corp., 127 F.3d 1136 (9th Cir. 1997).  Although "[t]he Fourth Amendment does not require law enforcement officers to exhaust every alternative before using justifiable deadly force," an officer should, if the circumstances permit, consider alternatives "reasonably likely to lead to apprehension before the suspect can cause further harm." Id.

The issue is whether a reasonable officer in Deputy Anderson's position would have armed himself with the SAGE gun.  The deputies drew their guns when they exited their squad cars, indicating they perceived Blanford as a threat and that deadly force might be necessary.  The SAGE gun is kept inside a case in the trunk of the squad car.  (Smith Depo. at 13, 17.)  Once the SAGE is removed from its case, it requires three to five seconds to load.  (Id. at 13.) Blanford was only walking away from the deputies, so it appears possible that Deputy Anderson could have retrieved the SAGE gun once

it became apparent that Blanford was not complying with the deputies'
commands.

According to documentation provided by the manufacturer, one
of the SAGE gun's primary functions is "[n]eutralizing a knife
wielding mentally deranged person."  (Smith Depo. Ex. 39.)
Plaintiff's expert testified that, if Deputy Anderson had a SAGE gun
in the trunk, retrieving it "certainly . . . would have been an
option."  (Ayoob Depo. at 116.)  But the expert also recognized that a
deputy would hesitate to leave his partner alone with an armed suspect
while retrieving the SAGE gun.  (Id.)  Even if through "20/20 vision
of hindsight," Deputy Anderson might have been wise to retrieve the
SAGE gun, this does not establish a violation of Blanford's
constitutional rights.  Graham, 490 U.S. at 396.  An objectively
reasonable officer could have decided that taking the time to open the
trunk of his squad car, remove the SAGE gun from its case and load it
would create an unjustifiable risk to his partner, who would be left
alone to handle an armed, non-compliant person who might have been
mentally disturbed or under the influence of narcotics.

An objectively reasonable officer could have perceived
Blanford as a threat to the officers' safety and to anyone in the path
of his travel or who tried to interfere with his movement.  Blanford
was armed with a sword, exhibiting bizarre behavior, and refused to
obey the deputies' commands or to communicate with them in any way.
(Anderson Decl. ¶ 10; Hengel Decl. ¶ 10.)  The deputies had shouted
repeated warnings at Blanford, threatening he could be shot if he did
not drop the sword.  The last command to drop the sword was given
moments before the shooting commenced, "when [Blanford] was on the
driveway" in front of the garage; Anderson "told him we did not want

21

to shoot you." (Anderson Depo. at 118.)  The deputies had followed Blanford, from a safe distance, down one residential neighborhood street and then on another while Blanford walked in the street failing to comply with the deputies' repeated commands.  It was reasonable for the deputies to follow him from a safe distance because of concerns about their own safety and to ensure he did not harm anyone in the path of his travel.  When Blanford "held up the sword and made a loud growl or roar sound" "near the corner of Reetey and Gaines," (Anderson Decl. ¶ 7; Hengel Decl. ¶ 7), that action could have intensified concern of a reasonable officer on the scene that Blanford was showing defiance of the officers' authority and was not willing to be detained.

When the deputies saw Blanford walking in front of the corner of the garage of the residence where a gate to the rear yard was located, they feared he was an armed threat to any individual on the premises, and that he could be attempting to enter the private residential property to harm others and to evade detention.  The deputies reasonably perceived Blanford was an imminent serious threat of danger to others at that point.  Therefore, when they then shot him, this use of deadly force, considered from an objectively reasonable viewpoint, did not violate the Fourth Amendment.

　　　　2.  <u>Necessity for Deadly Force During Second Volley</u>[3]

Further, after Blanford entered the gate and the gate closed behind him, Deputy Anderson was justified in kicking it open.  An objectively reasonable officer would have perceived Blanford as an armed imminent threat to any occupant on the property.  When Deputy

_____

[3]　　　The record reveals Deputy Hengel did not fire any shots characterized as the second and third volleys.

Anderson observed Blanford attempting to open and enter the side door to the garage with the sword still in his grasp, Deputy Anderson's decision to shoot Blanford was objectively reasonable because he appeared to pose an imminent threat to any person inside the residence.

> 3. <u>Necessity for Deadly Force During Third Volley</u>

The record contains conflicting versions of what happened during Blanford's characterization of the third volley. This conflict concerns the point in time after which Blanford released the door knob. According to Deputy Anderson's version, he had received information that Blanford "was exhibiting bizarre behavior, walking down the street licking a sword." (Anderson Depo. at 131.) At one point during Deputy Anderson's foot walking pursuit of Blanford, he witnessed Blanford "flex[] his upper body, tighten[] up his arms" and make an "angry and frustrated growl." (<u>Id.</u>) "And then after he had been hit by gunfire, he continued to walk away from [the deputies.]" (<u>Id.</u>) Since Blanford had not been "stopped by gunfire," Deputy Anderson believed Blanford "posed a very serious threat to whoever may be in the back yard" and that he could be trying to escape into another yard where other persons' safety would be placed in jeopardy. (<u>Id.</u>)

Thus, Deputy Anderson concluded he was justified in shooting Blanford in the back after Blanford ceased touching the door knob but then continued walking toward the back yard enclosure. Deputy Anderson testified the shooting "was more of a continuous event. It wasn't a pause. But when [Blanford] turned and started walking away, [he] kept firing and he went down." (<u>Id.</u> at 132-33.)

1   Blanford's version is that after he was shot in the area
2   near the side door to the garage, he "got swung around, so [he] was
3   facing them, . . . [f]acing where [he] thought the bullets were coming
4   from." (Blanford Depo. at 188.)  "And then [Blanford] put [his] hand
5   in front of [his] face," (id.), and got shot in the front of his body.
6   (Id. at 194.)  According to Blanford, there was a sufficient pause in
7   the shooting for him to raise one of his hands in front of his face.
8   At this point, Deputy Anderson shot him again, causing him to
9   collapse.

10   The question that must be answered, then, is whether a
11   genuine issue of material fact exists regarding whether Deputy
12   Anderson's actions – as defined by Blanford's version of the events –
13   were objectively reasonable.  The conflict concerns whether Blanford
14   was walking away from Deputy Anderson at the time of that shooting or
15   facing Deputy Anderson.  Deputy Anderson testified Blanford was shot
16   in the back, whereas Blanford's testimony indicates he was facing
17   Deputy Anderson with his hand in front of his face when he was shot in
18   the front of his body.  These conflicting versions of this shooting
19   raise a factual dispute as to whether Deputy Anderson "reasonably
20   could have perceived things to be as [he] testified they were," and
21   whether this difference in versions of what happened sufficiently
22   undercut Deputy Anderson's contention that he was reasonable in
23   believing the circumstances justified using deadly force against
24   Blanford.  Gooden v. Howard County, Md., 917 F.2d 1355, 1363 (4th Cir.
25   1990).  For purposes of ruling on Deputy Anderson's summary judgment
26   motion only, it is assumed that Blanford turned reflexively, facing
27   Deputy Anderson and lifting his hand, at which point there was a pause
28   in the shooting, and he was then shot again.

24

1   If a jury believes Blanford's version of the third volley of
2   shooting, the reasonableness of Deputy Anderson's use of deadly force
3   is questionable because the reason he stated as justification for
4   shooting Blanford in the back would appear discredited.  "If a
5   reasonable officer could have believed his conduct legal under one
6   version of what occurred, but could not have so believed under a
7   conflicting version, then further factual development will be
8   necessary."  Id. at 1361.  Here, Blanford and Deputy Anderson present
9   diametrically opposed versions about whether Blanford was walking away
10  from Deputy Anderson when he was shot or was facing him with one hand
11  in front of his face at the time of the shooting.  Depending on which
12  version a jury believes, a different outcome could result.

13  Blanford's version makes his and Deputy Anderson's
14  credibility crucial to decision on this excessive force issue.  But
15  credibility determinations are not the province of the judge at the
16  summary judgment stage of the proceeding, and Blanford's version is to
17  be believed at this stage.  For the stated reasons, Deputy Anderson's
18  motion for summary judgment on what has been characterized as the
19  third volley of shooting is denied.

20  Further, Blanford's motion is denied because Deputy
21  Anderson's version is to be believed when ruling on Blanford's motion.
22  Blanford's argument that even crediting Deputy Anderson's version
23  shows use of excessive force fails to evince recognition of the need
24  to evaluate whether Deputy Anderson's use of force resulted from
25  "split-second judgments" under the standard the Supreme Court
26  enunciated in Graham, 490 U.S. at 397.

27
28

B.   WRONGFUL ARREST CLAIM

Blanford argues the deputies violated his Fourth Amendment rights by arresting him for violating California Penal Code section 417.8 without probable cause.[4]  According to the deputies, they determined they had probable cause to arrest Blanford because he raised the sword and made a guttural sound, which the deputies considered as a violation of California Penal Code section 417.8. (Anderson Decl. ¶ 7; Hengel Decl. ¶ 7.)  This statute prescribes: "Every person who draws or exhibits any . . . deadly weapon, with the intent to resist or prevent the arrest or detention of himself or another by a peace officer" is guilty of a felony.  Probable cause to arrest exists when an arrest is objectively reasonable based on the "circumstances of the arrest . . . ."  United States v. Sayetsitty, 107 F.3d 1405, 1414 (9th Cir. 1997).

Blanford's act of moving away from the deputies while carrying the sword, and then brandishing the sword and making "a loud growl or roar sound," (Anderson Decl. ¶ 7; Hengel Decl. ¶ 7), created probable cause to believe he had violated the statute.  See People v. Pruett, 57 Cal. App. 4th 77, 87 (1997) ("[T]he intent to use [a deadly weapon] to resist arrest or detention may be established solely from the context in which it is drawn or exhibited (i.e., after a subject is told to raise his or her hands or that he or she is under arrest), regardless of the manner in which the weapon is drawn or exhibited.").  Therefore, the deputies' motion for summary judgment is granted on Blanford's wrongful arrest claim.

---

[4]    Blanford's Complaint alleges that he was arrested and charged with violating California Penal Code § 417.8.  (Compl. ¶ 25.) Although it is unclear whether the deputies placed Blanford under arrest, Defendants have not disputed this fact.

C.   QUALIFIED IMMUNITY

Even if it had been concluded that the use of force in connection with what has been characterized as the first and second volleys of shootings and that Blanford's arrest violated his clearly established rights, the deputies are entitled to qualified immunity from liability for these claims.   This is because

> "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and [the deputies] reasonably could have believed that [their] conduct was lawful under the circumstances.

Johnson v. County of Los Angeles, ___ F.3d ___, 2003 WL 21947127 at *7 (9th Cir., Aug. 15, 2003).

But since Blanford's factual version concerning the third volley must be accepted as true, Deputy Anderson does not prevail on his summary judgment motion for a defense judgment based on his qualified immunity defense.   Credibility issues are involved with that defense which have to be decided by a jury.

D.   INDIVIDUAL CAPACITY CLAIM AGAINST THE SHERIFF

Blanford argues that the Sheriff is liable in his individual capacity for ratifying the deputies' unreasonable use of force.   Only the third volley fired by Deputy Anderson was arguably unreasonable. Therefore, any individual capacity claim against the Sheriff must be based on that shooting.   See Larez v. City of Los Angeles, 946 F.2d 630, 645 (9th Cir. 1991) ("Like the officers, [the Police Chief's] individual liability hinges upon his participation in the deprivation of constitutional rights.").

Blanford contends the Sheriff ratified Deputy Anderson's conduct by giving him a letter of commendation following the shooting.

1 | (Anderson Depo. at 143-45.)  Blanford argues, relying on <u>Larez</u>, this
2 | conduct constitutes ratification of an unreasonable use of force.  In
3 | <u>Larez</u>, the Ninth Circuit held that a police chief could be liable in
4 | his individual capacity for violating the plaintiff's rights where,
5 | knowing that his officers had engaged in egregious misconduct while
6 | executing a search warrant, he personally informed the plaintiff that
7 | his complaint against those officers could not be sustained.  946 F.2d
8 | at 646.  Here, in contrast, Blanford presents no evidence that the
9 | Sheriff was aware of any facts indicating Deputy Anderson used
10 | excessive force.  The Sheriff relied on internal reports when deciding
11 | to issue the deputies letters of commendation.  (Blanas Depo. at 52.)
12 | The Sheriff had not seen Blanford's deposition testimony prior to this
13 | issuance.  (<u>Id.</u> at 53.)  Blanford presents no evidence that the
14 | Sheriff was aware of Blanford's version of the events constituting the
15 | third volley or had reason to doubt the deputies' version of what
16 | occurred.  Accordingly, the Sheriff's motion for summary judgment in
17 | his individual capacity is granted.

18 | E.  OFFICIAL CAPACITY AND MUNICIPALITY CLAIMS

19 |      Blanford argues that the County and the Sheriff in his
20 | official capacity are liable for maintaining a policy which encourages
21 | deputies to use excessive force.  Specifically, Blanford contends
22 | that, because the Sheriff's Department issues letters of commendation
23 | or higher awards to nearly every deputy who shoots a suspect, the
24 | Sheriff's Department encourages deputies to resort to deadly force.
25 | But this argument is not supported by the record.  When the Sheriff
26 | was asked whether any officers who were involved in shootings failed
27 | to receive a letter of commendation or medal, the Sheriff responded:
28 | "I believe there are.  I don't know if it was during my tenure as

1  sheriff, but I know in the past." (Blanas Depo. at 27.) Blanford

2  presents no evidence that any award issued was unmerited. The Sheriff

3  testified: "You don't get a medal because you shoot somebody." (Id.)

4  Blanford does present evidence that the sergeant who

5  initially presented this incident to the awards committee did not

6  review the deputies' written statements. (Ilg Depo. at 28.) But the

7  sergeant spoke to the deputies about the shooting and viewed the

8  location where it occurred. (Id.) Further, the awards committee

9  independently reviewed the incident and all reports submitted before

10 making its decision.[5] (Id. at 13.) There is no evidence that either

11 the sergeant or the awards committee ever learned that Blanford

12 disputed the deputies' account of the third volley shooting or had

13 reason to doubt the deputies' account of what happened.

14 The evidence shows that, after multiple levels of review,

15 the Sheriff's Department determined the facts as known to it evinced

16 that the deputies had acted commendably. This evidence does not

17 support a reasonable inference that a "policy or custom" or even "a

18 one-time decision by a governmentally authorized decisionmaker . . .

19 played a part in [a] violation of federal law." Larez, 946 F.2d at

20 646 (internal punctuation and citations omitted). Accordingly,

21 summary judgment is granted to the Sheriff in his official capacity,

22 and to the County.

23 /////

24

25 [5]   Blanford also argues that the Sheriff's Department's

26 investigative reports were inadequate. Blanford contends that
   ballistics tests were not performed on the bullets recovered, but

27 fails to explain how such tests would have been helpful. He also
   argues that the deputies should have been separated after the

28 shooting, but does not explain how the failure to separate the
   deputies caused him injury.

F.  STATE LAW CLAIMS

       Blanford asserts claims for assault and battery against the deputies and the County, and for negligence against the County.[6] Defendants argue they are entitled to summary judgment on these claims, because the standard of reasonable force is the same under the Constitution and California law.  Where "the force used was not unreasonable [under the Fourth Amendment], the state law claim [for assault and battery under California law] must fail." *Johnson v. County of Los Angeles*, 340 F.3d 787, 794 (9th Cir. 2003). Accordingly, summary judgment is granted on Blanford's assault and battery claims arising out of the first and second volleys.[7] Blanford's claims against Deputy Anderson and the County arising from the third volley survive the motion.

       Defendants' moving papers fail to cite any authority supporting summary judgment on Blanford's negligence claim, which is asserted against the County.  Therefore, summary judgment on this claim is denied.


       IT IS SO ORDERED.

DATED:  September 26, 2003

                                   GARLAND E. BURRELL, JR.
                                   UNITED STATES DISTRICT JUDGE

---

       [6]   Plaintiff's opposition reveals he has abandoned his claims for negligent hiring and training.  (Pl.'s Opp'n at 3 n. 2.)

       [7]   Since Deputy Hengel only took part in the first volley, no claim against him for assault or battery remains.  Therefore, his summary judgment motion has been granted on all of Plaintiff's claims.

United States District Court
for the
Eastern District of California
September 29, 2003


* * CERTIFICATE OF SERVICE * *


2:01-cv-02068


Blanford

   v.

Sacramento County

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  September 29, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


     Stewart L Katz                    SF/GEB
     Law Offices of Stewart Katz
     1001 G Street                    VC/GGH
     Suite 100
     Sacramento, CA  95814

     John Michael Poswall
     Poswall White Kouyoumdjian and Cutler
     1001 G Street
     Suite 301
     Sacramento, CA  95814

     Raoul Anthony Bozio
     Porter Scott Weiberg and Delehant
     PO Box 255428
     350 University Avenue
     Suite 200
     Sacramento, CA  95865

     Carl J Calnero
     Porter Scott Weiberg and Delehant
     PO Box 255428
     350 University Avenue
     Suite 200
     Sacramento, CA  95865


Jack L. Wagner, Clerk

by: Deputy Clerk